UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA and
SOHAAN CHICHESTER-
SHEPPERD, ex rel.,

      Plaintiffs,

v.                                                                                 Case No: 2:16-cv-726-JLB-KCD

MILLENNIUM PHYSICIAN
GROUP, LLC, EBRAHIM PAPAN,
GEURT PEET, and TONY PEET,

      Defendants.
_____/

## ORDER[1]

In this *qui tam* action, Sohaan Chichester-Shepperd, the Relator here, filed a complaint under seal in September 2016 that raised several claims on behalf of the United States of America, and several claims in his personal capacity. (Doc. 1). After five years, the government declined to intervene. (Doc. 38). Thus, the complaint was thereafter unsealed, and Defendants were served in February 2022. (Doc. 40, Doc. 50, Doc. 51, Doc. 53, Doc. 54).

Now Defendants move to dismiss the complaint. (Doc. 66). The parties have fully briefed the issues. (Doc. 86; Doc. 95). For the following reasons, the motion is **GRANTED**.

---

[1] Documents hyperlinked to CM/ECF are subject to PACER fees. By using hyperlinks, the Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide, nor does it have any agreements with them. The Court is also not responsible for a hyperlink's availability and functionality, and a failed hyperlink does not affect this Order.

## BACKGROUND

Millennium Physician Group, LLC, is a comprehensive primary care practice operating in at least 71 locations throughout Southwest Florida and employing over 200 health care providers. (Doc. 1 at 5). Dr. Ebrahim Papan is a physician with Millennium, Geurt Peet is Millennium's CEO, and Tony Peet is Millennium's regional marketing director. (*Id.* at 5).

The Relator is a physician assistant who worked for Millennium for a little more than one year. (*Id.* at 4). He alleges that through several fraudulent practices, Defendants knowingly submitted false claims and unlawfully incentivized referrals to increase their billings and obtain money from the government to which they were not entitled. (*Id.* at 2–3). He states he brings this *qui tam* action based on direct, first-hand knowledge. (*Id.* at 6).

The Relator alleges he obtained this first-hand knowledge about Millennium's business operations and fraudulent claims in the course of his employment with the company. (*Id.* at 6). He extensively describes his job duties while employed by Millennium, which included:

- Identifying patient care issues, recommending options, and implementing physician directives;
- Interviewing and examining patients, and studying medical histories;
- Administering and ordering diagnostic tests, and interpreting results;
- Charting patient and department records;

- Administering injections and immunizations, suturing, and managing wounds and infections;

- Counseling patients, and promoting wellness and health maintenance;

- Developing and implementing patient management plans;

- Following cleanliness and infection-control policies;

- Maintaining professional, technical, and legal knowledge; and developing staff by providing information and education.

(*Id.* at 14–15). The Relator alleges that "[b]ased upon his unique position as a Physician Assistant, [he] was able to, and did, observe the Defendants['] submission of false claims to the [G]overnment." (*Id.* at 15). When he questioned Dr. Papan about his billing concerns, Dr. Papan allegedly responded, "this is just how it's done." (*Id.* at 7).

The Defendants' allegedly fraudulent actions included upbilling, unlawful referrals, unlicensed practice of medicine, and miscellaneous upcoding. (*Id.* at 15). Dr. Papan and Mr. Tony Peet allegedly operated under this system for the overwhelming majority of the patients seen, particularly Medicare patients. (*Id.* at 15). Dr. Papan and Mr. Tony Peet, with Mr. Geurt Peet's knowledge, allegedly falsified patient charts to justify unnecessary testing and referrals. (*Id.* at 15–16). Mr. Tony Peet and Dr. Papan allegedly mandated that all referrals for testing, specialist or secondary consultations, or home health agencies be sent to Millennium's labs, imaging centers, physicians, and home health facility; and Mr.

Tony Peet mandated that prescriptions be sent to Millennium's pharmacy. (*Id.* at 16–17).

Millennium allegedly incentivized health care providers by providing money in exchange for self-referrals for items and services that could be billed to a government health care program. (*Id.* at 17). Millennium allegedly caused claims from improper self-referrals, which generated unlawful kickbacks, to be submitted to government health care programs, and it allegedly billed those programs for unnecessary testing and home health services. (*Id.* at 18). Millennium allegedly knows of these fraudulent practices because it reviews the billing and patient charts, offers bonuses for improper practices, and receives the financial benefit of those practices. (*Id.*).

The Relator alleges Dr. Papan routinely falsely upbilled all patient encounters and directed the Relator to do the same. (*Id.* at 19). He asserts Dr. Papan falsely billed medical procedures his office manager (who has no medical licensing) performed. (*Id.* at 20). The Relator states that based on first-hand knowledge, Dr. Papan's billing was impossibly high, and "[t]he only explanation" is that Dr. Papan illegally upcoded to obtain financial rewards. (*Id.* at 19–20).

Finally, the Relator alleges Dr. Papan (and, by extension, Millennium) subjected him to harassment, abuse, and racial discrimination. (*Id.* at 21–22). He states that when he objected to almost daily slurs, Dr. Papan retaliated against him. (*Id.* at 22). He asserts that when he contacted Millennium about the discrimination and an unpaid bonus, he was immediately fired. (*Id.*) And he

further alleges Millennium offered him a "paltry" severance package in exchange for his waiver of all claims, including claims arising under the False Claims Act ("FCA") and Title VII. (*Id.*).

The Relator filed his eleven-count complaint in September 2016. (Doc. 1). In it, he alleges violations of the Anti-Kickback Statute[2] ("AKS") (Count I); violations of the Stark Law[3] (Count II); violations of the FCA[4] (Counts III–IV); violation of the Florida False Claims Act[5] (Count V); discrimination and retaliation under Title VII[6] (Counts VI, IX); discrimination and retaliation under the Florida Civil Rights Act[7] (Counts VII, X); violation of 42 U.S.C. § 1981 (Count VIII); and breach of contract (Count XI).

## PLEADING REQUIREMENTS

### A. Standard of Review

A court considering a motion to dismiss accepts the complaint's allegations as true and construes those allegations and all reasonable inferences that can be drawn from them in the relator's favor. *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015).

A relator must satisfy the general pleading standards of Federal Rule of Civil Procedure 8. The relator's complaint must contain "a short and plain statement of

---

[2] 42 U.S.C. § 1320a-7b(b).
[3] 42 U.S.C. § 1395nn.
[4] 31 U.S.C. § 3729 *et seq*.
[5] Fla. Stat. §§ 68.082(2)(a), (b), (g), 68.083(2).
[6] 42 U.S.C. § 2000e-2(a).
[7] Fla. Stat. § 760.10.

the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  And it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

But it is also well settled that Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements apply to complaints alleging violations of the FCA.  *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1309–10 (11th Cir. 2002).  "The particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior."  *U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 703 (11th Cir. 2014) (quoting *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir.2006) (quotation marks omitted)).

To satisfy this standard, a relator "must plead facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them."  Clausen, 290 F.3d at 1310 (11th Cir. 2002) (citations and internal quotation marks omitted).  And a relator must "allege the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government." *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005).  And so, "a relator must identify the particular document and statement alleged to be false, who made or used it, when the statement was made, how the statement was false, and what the defendants obtained as a result."

6

*Mastej*, 591 F. App'x at 703–04 (quoting *U.S. ex rel. Matheny v. Medco Health Sols. Inc.*, 671 F.3d 1217, 1225 (11th Cir. 2012)).

### B. The False Claims Act[8]

"The FCA imposes liability on any person who 'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.'" *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017) (quoting 31 U.S.C. § 3729(a)(1)(A)–(B)). "Liability under the [FCA] arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal policies." *Corsello*, 428 F.3d at 1012. A relator may not "describe a private scheme in detail but then . . . allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Clausen*, 290 F.3d at 1311. Instead, "some indicia of reliability must be given in the complaint to support the allegation of an actual false claim for payment being made to the Government." *Id.*

The FCA provides for penalties of $5,000–$10,000 per claim and treble damages. *Id.* at 1307–08 (citing 31 U.S.C. § 3729(a)). And if the government

---

[8] Because Florida's False Claims Act is modeled after the FCA, the Court will consider arguments for dismissal of the claims under both statutes together. *See U.S. ex rel. Heater v. Holy Cross Hosp., Inc.*, 510 F. Supp. 2d 1027, 1033 n.5 (S.D. Fla. 2007) ("The Florida FCA, is modeled after and tracks the language of, the federal False Claims Act.").

7

declines to intervene (as here), the plaintiff-relator can receive 25–30% of any recovery and reasonable expenses and attorneys' fees. *Id.* at 1308 (citing 31 U.S.C. § 3730(d)).

### C. The Stark Law

"The Stark Law prohibits doctors from referring their Medicare and Medicaid patients to business entities with which the doctors have a financial relationship." *Ameritox, Ltd. v. Millennium Labs., Inc.*, No. 8:11-CV-775-T-24-TBM, 2014 WL 1456377, at *3 (M.D. Fla. Apr. 14, 2014). One such financial relationship is a compensation arrangement involving any remuneration—directly or indirectly, overtly or covertly, in cash or in kind—between a doctor and the entity. *See id.* at *3 (citing 42 U.S.C. § 1395nn(a)(2)(B), § 1395nn(h)(1)). "Thus, the Stark Law prohibits doctors who have a compensation arrangement with an entity from making referrals of Medicare or Medicaid patients for clinical laboratory services to that entity." *Id.* at *3 (citations omitted).

### D. The Anti-Kickback Statute

The AKS "makes it a felony to offer kickbacks or other payments in exchange for referring patients 'for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.'" *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005) (quoting 42 U.S.C. § 1320a–7(b)(2)(A)).

8

## DISCUSSION

### A. Counts I and II: Anti-Kickback Statute and Stark Law Claims

In Counts I and II, the Relator alleges violations of the Anti-Kickback Statute and the Stark Law. Defendants move the Court to dismiss these counts with prejudice because neither statute provides private rights of action. (Doc. 66 at 2–3). The Relator concedes this point in his response.[9] (Doc. 86 at 11 n.3).

Because "neither Stark nor AKS provide private rights of action," *Ameritox, Ltd. v. Millennium Labs., Inc.*, 803 F.3d 518, 522 (11th Cir. 2015), Counts I and II are dismissed with prejudice.

### B. Counts III–V: FCA Claims

Defendants argue the Relator's FCA claims should be dismissed because the counts are not pleaded with particularity, as required by Rule 9(b). (Doc. 66 at 3–17). The Court will address each of Defendants' four specific arguments in turn.

First, Defendants contend the Relator has failed to identify with particularity any false claim submitted to and paid by the government. (*Id.* at 4–9). The Relator responds that a relator with personal knowledge of how claims were billed may both allege a scheme that renders a broad category of claims false and also allege false claims were likely submitted to the government. (Doc. 86 at 8–10).

---

[9] The Court appreciates the candor of the Relator's counsel in making this concession.

In *United States ex rel. Clausen v. Laboratory Corporation of America, Inc.*, the Eleventh Circuit explained the centrality of false claim submission to an FCA claim:

> The False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe. . . . Without the *presentment* of such a claim, while the practices of an entity that provides services to the Government may be unwise or improper, there is simply no actionable damage to the public fisc as required under the False Claims Act. . . . The submission of a claim is thus not, as Clausen argued, a "ministerial act," but the *sine qua non* of a False Claims Act violation.

*Clausen*, 290 F.3d at 1311 (citations omitted). The court concluded Clausen's complaint fell short because it had no allegation stating with particularity a false claim actually submitted to the government. *Id.* at 1311-12. The court noted Clausen's complaint did not identify amounts charged, allege actual dates, describe policies about billing or second-hand information about billing practices, or provide a bill or proof of payment. *Id.* at 1312. And as a corporate outsider, Clausen could offer no other indicia of reliability for his claims. *Id.* at 1314.

Next, in *United States ex rel. Mastej v. Health Management Associates, Inc.*, a case on which the Relator heavily relies, the Eleventh Circuit offered an alternative path to establishing reliability. 591 F. App'x at 707–09. There, Mastej held two executive positions with the defendant corporations, through which he gained direct information about billings and revenues, and he was present for meetings in which executives discussed the submission of Medicare bills. *Id.* at 695–96, 707-08. The

10

court concluded that, given Mastej's extensive experience and access to first-hand knowledge, the complaint had sufficient indicia of reliability to state a claim with the requisite particularity required by Rule 9(b). *Id.* at 707–09. But the court was also explicit that the fraud alleged in that case did not depend as much on particularized medical or billing content of any given claim form—and that distinction was "critical" to the court's conclusion.[10] *Id.* at 708.

This case is inapposite to what the Eleventh Circuit addressed in Mastej. The claims here fall squarely within the categories of cases the Eleventh Circuit listed as relying heavily on particularized medical or billing content of particular claim forms. *See id.* (*e.g.*, claims for services not rendered and claims for services that were unnecessary, overcharged, or miscoded). Unlike the Relator here, Mastej gained direct personal knowledge through his years of executive employment with the defendant and the exposure to the defendant's billing practices and decisions. *Id.* at 695–96, 707-08. Here, the Relator is a physician assistant whose detailed job description includes no experience in billing or claim submission. (Doc. 1 at 14–15). And yet he alleges, without support, that "[b]ased upon his unique position as a Physician Assistant, [he] was able to, and did, observe the Defendants['] submission

---

[10] Mastej "turn[ed] on the [d]efendants' submitting interim claims to the government for referred Medicare patients after having engaged in an incentive-for-referral scheme and then falsely certifying at year-end that they [had] complied with the applicable healthcare laws." 591 F. App'x at 708. The Eleventh Circuit explained that though the patient name was necessary to determine if the patient was referred by one of the doctors implicated in the scheme, "the type of medical service rendered and described in that interim claim, the billing code, or what was charged for that service are not the underlying fraudulent acts." *Id.*

11

of false claims to the [G]overnment." (*Id.* at 15). The closest thing he has to information gained from a reliable source is the off-hand comment ("this is just how it's done") from a doctor without billing or claim submission knowledge. (*Id.* at 7). With no allegation stating with particularity a false claim submitted to the Government, or other indicia of reliability, the Relator's claims are insufficient.[11]

Second, Defendants assert dismissal is appropriate because the Relator has not adequately pleaded the "who, what, when, or how" of the allegedly fraudulent conduct with the specificity that Rule 9(b) requires. (Doc. 66 at 9–16). The Relator responds that he has satisfactorily alleged from his own personal knowledge and experience facts essential to Defendants' alleged kickback and self-referral schemes. (Doc. 86 at 8–11).

But the Relator's allegations cannot establish he had direct knowledge either obtained from a reliable source or acquired through experience with Defendants' billing. And it is insufficient to describe an allegedly fraudulent scheme without including examples of the conduct described. *See U.S. ex rel. Chase v. HPC Healthcare, Inc.*, 723 F. App'x 783, 790–91 (11th Cir. 2018) ("Without details to support her conclusory allegations of wrongdoing, [relator's] complaint lacks the

---

[11] The Relator also relies on *U.S. ex rel. Walker v. R & F Properties of Lake County, Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005), in which the Eleventh Circuit concluded "that Rule 9(b) was satisfied where the relator was a nurse practitioner in the defendant's employ whose conversations about the defendant's billing practices with the defendant's office manager formed the basis for the relator's belief that claims were actually submitted to the government." *See Mastej*, 591 F. App'x at 704. As in *Mastej*, the Relator here and the relator in *Walker* are not similarly situated because there is no link between the Relator here and anyone who was responsible for office billing.

12

necessary 'indicia of reliability under Rule 9(b).").  Because the complaint here does not include underlying factual bases for his assertions about Defendants' allegedly fraudulent kickback and self-referral schemes, it is insufficient.

Third, Defendants argue the FCA counts should be dismissed based on the Relator's use of the collective "Defendants" throughout the background section and the FCA counts.  (Doc. 66 at 16).  The Relator does not address this argument.

The lumping together of several defendants to allege generally their collective participation in a fraud scheme cannot meet Rule 9(b)'s particularity requirement. *United States v. Norman*, No. 8:15-cv-1506-T-23AEP, 2018 WL 264253, at *1 (M.D. Fla. Jan. 2, 2018).  A relator must, instead, "describe with particularity each defendant's participation in the alleged fraud . . . ." *See id.*

The Relator's FCA counts repeatedly refer to Defendants collectively.  (See Doc. 1 at 25–32).  And though it is less frequent, the Relator also uses this shorthand in the complaint's background section.  (See *Id.* at 1–21).  Both for this reason and for the reasons outlined above, the Relator has not pleaded "details of . . . [D]efendants' allegedly fraudulent acts, when they occurred, and who engaged in them" sufficient to satisfy Rule 9(b).  *See Clausen*, 290 F.3d at 1310 (citations omitted).

And finally, Defendants seek dismissal of any claims submitted before or after the Relator's term of employment with Millennium because any such claims would lack sufficient indicia of reliability.  (Doc. 66 at 16–17).  The Relator does not address this argument.

The Eleventh Circuit has never held, or even suggested for that matter, that a relator can never base his case on false claims submitted outside of his employment with the would-be defendant. *See, e.g.*, *Mastej*, 591 F. App'x at 709. As such, the Court is unwilling to reject out of hand any claim that does not fit neatly within the term of the Relator's employment. Still, these claims suffer from the same defect that dooms Relator's other FCA claims: they do not meet the heightened pleading requirements of Rule 9(b) or comport with Eleventh Circuit precedent.

For all of these reasons, the FCA claims are dismissed.

### C. Counts VI–XI: Employment and Contract Claims

In the remaining counts, the Relator raises various employment and contract claims. Defendants argue these counts should be dismissed because they are improperly raised in this *qui tam* action and because the Relator failed to serve the counts on Defendants within the time set out in Federal Rule of Civil Procedure 4(m). (Doc. 66 at 17–24). The Relator counters that he pursues these claims on his own behalf and that Defendants "retaliated against him for [his] protected activity of resisting [Defendants'] illegal referrals and kickbacks," and litigation of his employment claims would likely implicate or even resolve the FCA claims. (Doc. 86 at 13–15).

Despite the Relator's characterization, the allegations underpinning his employment and contract claims do not concern, involve, or implicate the allegations that support his FCA claims. To be specific, Counts VI through X all

14

allege discriminatory treatment and retaliation based on the Relator's national origin or race. (Doc. 1 at 32–43). And Count XI alleges Millennium breached its contract with the Relator by failing to pay him a non-discretionary bonus. (*Id.* at 43–44). These claims and the factual allegations that support them (*Id.* at 21–22) do not mention Defendants' alleged FCA violations. And so, the Court finds unpersuasive the Relator's attempt to characterize his delay as faithful compliance with the FCA's procedures.

The Court is, however, persuaded by Defendants' argument that these claims have no place in a qui tam action. *See Walker v. Cmty. Educ. Ctrs., Inc.*, No. CV-12-02582-PHX-JAT, 2013 WL 4774778, at *2 (D. Ariz. Sept. 5, 2013) (dismissing Title VII claims without prejudice because, in an FCA case, the plaintiff is the government, whereas in an employment lawsuit, the harmed individual is the plaintiff); *see also Makro Cap. of Am., Inc. v. UBS AG*, 543 F.3d 1254, 1259 (11th Cir. 2008) (would-be relator's "original claim seeking personal recovery for fraud (and other torts) committed against it would be entirely inapposite from its qui tam claim seeking recovery for fraud committed against the United States"). Because a qui tam action pursues the Government's interests, it should not be combined with an action for personal damages. Instead, claims for personal damages should be dismissed without prejudice to them being reasserted in a separate lawsuit. *See id.*

The Court is also persuaded by Defendants' second ground for dismissal: the Relator's failure to effect service of process on time. A plaintiff must serve the

15

defendant with a summons and the complaint within 90 days of filing the complaint.[12] Fed. R. Civ. P. 4(c)(1), (m). If the plaintiff fails to meet this deadline,

> the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m). "Good cause" exists only when some outside factor, like reliance on faulty counsel, prevented service; neither inadvertence nor negligence constitutes good cause. *Lepone-Dempsey v. Carroll Cnty. Comm'rs*, 476 F.3d 1277, 1281 (11th Cir. 2007).

But a court may extend the time for service of process even with no good cause. *Id.* at 1282. The Eleventh Circuit has said a court's exercise of such discretion would be justified when "the applicable statute of limitations would bar the refiled action." *Id.* (quoting Fed. R. Civ. P. 4(m), Advisory Committee Note, 1993 Amendments). That is because, although Rule 4(m) explicitly provides for dismissal without prejudice, a dismissal is effectively with prejudice where it precludes the refiling of the plaintiff's claim because of the running of the statute of limitations. *Parrish v. Ford Motor Co.*, 299 F. App'x 856, 862 (11th Cir. 2008).

And so, the Eleventh Circuit has held that "when a district court finds that a plaintiff fails to show good cause for failing to effect timely service pursuant to Rule 4(m), the district court must still consider whether any other circumstances warrant

---

[12] Rule 4(m) was revised in 2015 to decrease the time for filing from 120 days to 90 days.

an extension of time based on the facts of the case." *Lepone-Dempsey*, 476 F.3d at 1282. Only after considering the facts of the case may the court exercise its discretion to dismiss without prejudice or grant additional time for service to be executed. *Id.* That said, although the running of the statute of limitations must be considered, it "does not require that the district court extend time for service of process under Rule 4(m)." *Id.*

This brings us to a second reason that the claims in this complaint are incompatible: "The procedural differences between personal and *qui tam* litigation are so great that it is often impractical to pursue both claims in one suit—and sometimes impossible, as when the United States takes more than [90] days to decide whether to intervene . . . ." *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 852–53 (7th Cir. 2009).

The Relator did not serve process on Defendants within 120 days after he filed the complaint. And—aside from mischaracterizing his personal damages claims as being too interrelated with the FCA claims to stand alone—he has not tried to show good cause for this years-long delay. No other circumstances in this case warrant the Court's exercise of discretion to extend the time for service. Quite the contrary, Defendants were served with the complaint six years after the Relator filed the complaint, and they have represented that their ability to defend the employment claims has been materially hampered by this delay. (Doc. 66 at 21–22 n.13).

17

The Court understands and has considered that the statute of limitations may preclude the Relator's ability to refile his employment and contract claims. But considering the facts here, dismissal is more than justified. Counts VI through XI are dismissed without prejudice.

## CONCLUSION

Accordingly, it is now

**ORDERED:**

(1) Defendants' Motion to Dismiss (Doc. 66) is **GRANTED**;

(2) Counts I and II are **DISMISSED WITH PREJUDICE**;

(3) Counts III through XI are **DISMISSED WITHOUT PREJUDICE**;

(4) If Mr. Chichester-Shepperd intends to file an amended complaint, he is directed to do so by March 8, 2023. Otherwise, this case will be closed without further notice.

**ORDERED** at Fort Myers, Florida on February 15, 2023.

_____
JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE